Parker-SM v. State















IN THE
TENTH COURT OF APPEALS
 

No. 10-97-229-CR

     JOHN ROBERT DENK,
                                                                              Appellant
     v.

     THE STATE OF TEXAS,
                                                                              Appellee
 
 
From the 54th District Court
McLennan County, Texas
Trial Court # 97-17-C
                                                                                                                 

MEMORANDUM OPINION
                                                                                                                 

      Appellant John Robert Denk pled guilty to the felony offense of driving while intoxicated
without the benefit of a plea recommendation from the State. See Tex. Penal Code Ann. §
49.09(b) (Vernon 1994). Denk also pled true to a prior burglary conviction alleged to enhance his
punishment to the level of a second degree felony. The court assessed Denk's punishment at fifteen
years’ confinement. Denk has filed a motion to dismiss his appeal. In relevant portion, Rule 42.2
of the Texas Rules of Appellate Procedure states:
(a) At any time before the appellate court’s decision, the appellate court may dismiss the
appeal if the appellant withdraws his or her notice of appeal. The appellant and his or her
attorney must sign the written withdrawal and file it in duplicate with the appellate clerk,
who must immediately send the duplicate copy to the trial court clerk.
 
Tex. R. App. P. 42.2(a).
      We have not issued a decision in this appeal. The motion is signed by both Denk and his
attorney. Thus, the motion meets the requirements of the rules and is granted.
      Denk's appeal is dismissed.
                                                                               PER CURIAM
 
Before Chief Justice Davis,
      Justice Cummings, and
      Justice Vance
Dismissed on appellant's motion
Opinion delivered and filed October 1, 1997
Do not publish



 the jury. Judge
Wayne Bridewell, judge of the 249th District Court in Johnson County, met with the parties
outside the presence of the jury. He informed the parties that Judge Cooke had become ill and had
been taken to the hospital. Judge Bridewell then informed the jury of Judge Cooke's illness and
recessed the jury for the day.
          The following morning, Judge Bridewell met with the parties in chambers. He informed
them that Judge Cooke had suffered chest pains and numbness in his left arm, that he had been
taken to the hospital by ambulance, that he was in serious but stable condition, and that his doctor
anticipated his being away from work at least a week. Judge Bridewell informed the parties that,
due to Judge Cooke's unavailability, he intended to proceed with trial. He also informed the
parties that, at his direction, the court reporter had transcribed the previous day's testimony. 
Judge Bridewell inserted into the record a copy of the local rules of Johnson County, which had
been approved by the Texas Supreme Court, and a copy of an "Administrative Assignment"
authorizing the judge of the 249th District Court (among others) to "hold hearings and dispose of
cases when any Judge is unavailable for any reason as long as that Judge has jurisdiction by the
Constitution or statute to hear same."
          Braziel moved for a mistrial based on manifest necessity, due course of law under the
Texas Constitution, and the due process provisions of the United States Constitution. He argued
that, although Judge Bridewell had a transcript of the testimony, he was not "in a position to
evaluate the credibility of the witnesses." Furthermore, Braziel believed he would be prejudiced
by "the change of judges, and demeanors, and styles." Judge Bridewell denied the motion for
mistrial.
          In his first point, Braziel asserts that he was denied due process and effective assistance of
counsel when Judge Bridewell denied his motion for mistrial. District judges may "hold courts
for each other when they may deem it expedient . . . ." Tex. Const. art. V, § 11. "[T]he
common-law rule requiring that the same judge preside throughout the trial of a felony case has
been expressly abrogated by the Constitution and statutes of this State." Randel v. State, 153 Tex.
Crim. 282, 219 S.W.2d 689, 698 (1949) (opinion denying rehearing) (defendant not denied right
to jury trial by agreed substitution of judges). Likewise, the Court of Criminal Appeals did not
find error when one judge presided in voir dire in a murder case and another presided during the
hearing of the evidence and the receipt of the jury's verdict. Bellah v. State, 415 S.W.2d 418, 420
(Tex. Crim. App. 1967).
          The First Court of Appeals has addressed a due-process, due-course-of-law challenge under
similar facts. Ramirez v. State, 822 S.W.2d 240, 246 (Tex. App.—Houston [1st Dist.] 1991, pet.
ref'd). Ramirez was charged with the felony offense of delivery of cocaine. After two days of
testimony, the trial judge turned the bench over to another judge because of a family commitment. 
Id. Ramirez objected to the change because, among other things, a motion to suppress was being
"carried" with the trial, a motion to determine entrapment as a matter of law was pending, and
there was a question of whether the court would instruct a verdict of not guilty. Id. The second
judge stated that, if called upon to rule on such matters, he would have the court reporter "read
to the Court any pertinent portions of the testimony." Later, when Ramirez presented his
entrapment claim and motion for instructed verdict, the second judge withheld his ruling until he
reviewed the transcription of the court reporter's notes. Id. The First Court overruled Ramirez'
complaint. Id.
          Braziel asserts that Judge Bridewell was "not informed of the prior proceedings and was
joining the trial in mid-witness without any previous involvement in the case." The docket sheet
reflects that on February 9, Judge Bridewell heard and approved Braziel's motion to appoint a
doctor to determine his competency


 and that Judge Bridewell heard "various motions" that day. 
The docket sheet also indicates that the stepmother took the stand just before 10 a.m., that the jury
recessed for lunch from 11:30 a.m. until 1 p.m., and that Judge Cooke became ill at 2:15 p.m. 
 Although Judge Bridewell did not personally observe the testimony of the outcry witness, he was
present during part of the cross-examination and all of the redirect examination of the victim. 
Furthermore, the jury—the trier of facts on guilt and punishment—was present during the entire
trial. 
          Braziel's only other complaint about Judge Bridewell's rulings regards the denial of his
motion for a directed verdict. As discussed below, the court's ruling was not erroneous. Braziel
has not shown that he was harmed by the substitution of judges in any meaningful way. See id. 
          As to Braziel's effective-assistance-of-counsel complaint, he cites no deficiencies of counsel
which deprived him of a fair trial. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,
80 L.Ed.2d 674 (1984); Stafford v. State, 813 S.W.2d 503, 505-06 (Tex. Crim. App. 1991). 
          We overrule point one.
          Braziel's second point complains that the court erred in overruling his motion for a directed
verdict. After the State rested and Braziel had presented defense testimony from several
witnesses, he moved for an instructed verdict of not guilty. Judge Bridewell denied the motion.


 
In his third point, Braziel asserts that the evidence is "insufficient to support a finding of guilt on
the indictment as written where there was no testimony that on ten separate occasions the appellant
sexually assaulted the complainant."
          A challenge to the court's ruling on a motion for an instructed verdict is, in actuality, a
challenge to the sufficiency of the evidence to support the conviction. Madden v. State, 799
S.W.2d 683, 686 (Tex. Crim. App. 1990). In reviewing the sufficiency of the evidence, we
consider all the evidence, both State and defense, in the light most favorable to the verdict. Id. 
If the evidence is sufficient to sustain the conviction, the court did not err in overruling Braziel's
motion. Id. Stated another way: If any rational trier of fact could find the elements of the offense
beyond a reasonable doubt, an instructed verdict is not proper. Id. Because we must conduct the
same sufficiency review for points two and three, we will simultaneously address the points.
          The indictment alleged ten counts of aggravated sexual assault of a child. Five counts
alleged that on five dates Braziel "intentionally and knowingly cause[d] the male sexual organ of
[the victim], a child younger than 14 years of age who was not the spouse of said defendant[,] to
contact the mouth of said defendant." The offenses were alleged to have occurred on September
15, 1992, January 15 and July 15, 1993, and January 15 and May 1, 1994. Five counts alleged
that, on the same five dates, Braziel "intentionally and knowingly cause[d] the penetration of the
mouth of [the victim], a child younger than 14 years of age who was not the spouse of said
defendant[,] with the male sexual organ of said defendant."
          We will summarize the evidence in the light most favorable to the verdict. M.B. is the son
of Vance Braziel and Kim Braziel. Vance and Kim had three children during their
marriage—M.B., his older brother V.B., and his younger sister R.B. Vance and Kim divorced
as a result of her relationship with David Braziel, Vance's brother. Kim and David eventually
married. Vance entered into a common-law marriage with Mary Evans. M.B. is the nephew and
stepson of the defendant. 
          Mary, the victim's stepmother, testified that M.B. and his siblings lived with Kim and
David in Grandview until about June 1, 1994. Mary testified that M.B. attended the second and
third grades in Grandview. At the end of the 1994 school year, Kim asked Vance and Mary to
take the children for the summer of 1994. The children remained with Vance and Mary after the
summer and enrolled in the Mansfield school district in the fall of 1994.
          Mary testified that on October 30, 1994, she and the two boys began talking about physical
abuse. They then began discussing sexual abuse and Mary told them, "if anybody ever touched
them where they didn't feel comfortable, tell me." According to Mary, M.B. became quiet and
asked to talk to her in private. Mary and M.B. went to his room and he related his story to her:
          [MARY]:      . . . . And he told me his stepfather, David Braziel, well, he used the word
"dick," had sucked his dick. And David had made him suck David's dick. 
And he told me that David peed in his mouth. And I said, what do you
mean? He said, well, white stuff came out and it made him sick, made him
throw up. And he told me that this happened several times, usually at
nighttime. And he told me that David would get him to get a hot dog to
practice on. He said to get the hang of it, to get used to it, that it was part
of life. That's what [M.B.] told me.
 
          [STATE]:      Did he tell you that this happened more than once?
 
          [MARY]:      Yes.
 
          [STATE]:      And did he tell you over what period of time this happened?
 
          [MARY]:      Well, he said it had happened for a couple of years.
Mary testified that, although M.B. had not told her a specific number of times these assaults had
occurred, he told her that "it had happened a lot."
          M.B. was an eleven-year-old fourth grader at the time of trial. He testified that, while he
was in the second and third grades, he had lived in Grandview with his mother, Kim, stepfather,
David, and his brother and sister. M.B. said that on one occasion, while his brother was away
spending the night with their step-grandmother, he was "sexually abused by [his] stepdad"—David
Braziel. M.B. testified that Braziel came into his bedroom during the night dressed in underwear
and, when M.B. woke up, "David Braziel was sucking on me. He made me suck on him." M.B.
further testified that Braziel was "sucking" on M.B.'s penis and that Braziel made M.B. "suck on
[his penis]." He said that Braziel "put sperm in my mouth." M.B. testified that he "got sick and
threw up." 
          The State then questioned M.B. about other details of the assaults and about the number
of times such incidents had occurred:
          [STATE]:      Did it happen more than one time?
 
          [M.B.]:         Yes.
 
          [STATE:       Let me ask you, [M.B.], I want you to think about this. Did he put his
penis, his penis, David Braziel's penis, in your mouth as many as five times
during the time that you were living in Grandview in the second and third
grades?
 
          [M.B.]:         Yes.
 
          [STATE]:      Did he put your penis in his mouth, the mouth of David Braziel, as many
as five times during the time you were living in Grandview, that is during
the second and third grade?
 
          [M.B.]:         Yes.
 
          [STATE]:      Now, did he also ask you to do something with a hot dog?
 
          [M.B.]:         Yes.
 
          [STATE]:      What is that?
 
          [M.B.]:         He told me to suck on it. . . . Because every time he put his penis in my
mouth I gagged.
 
          [STATE]:      And so why did he want you to do something with a hot dog?
 
          [M.B.]:         So I would get the hang of it, sucking on his, so I would get the hang of it.
          M.B. testified that the last incident happened at the end of third grade, just before he
moved out of Harold's Mobile Home Park in May 1994. The State questioned him further on the
number of incidents:
          [STATE]:      It happened at least five times to where he put his penis in your mouth; it
that right?
 
          [M.B.]:         Yes.
 
          [STATE]:      And it happened at least five times to where he put your penis in his mouth;
is that right?
 
          [M.B.]:         Yes.
          An indictment must allege "some date anterior to the presentment of the indictment, and
not so remote that the prosecution of the offense is barred by limitation." Tex. Code Crim.
Proc. Ann. art. 21.02(6) (Vernon 1989). Proof of the date is sufficient if the State proves the
offense occurred on a date anterior to the presentment of the indictment but within the statutory
limitations period. Ex parte Alexander, 685 S.W.2d 57, 59 n.1 (Tex. Crim. App. 1985). The
dates alleged are within the applicable ten-year statute of limitations. Tex. Code Crim. Proc.
Ann. arts. 12.01(2)(D), 12.03(d) (Vernon Supp. 1996). 
          The State established that M.B. was in the second and third grades in Grandview during
the dates alleged in the indictment. M.B. testified that during this time, Braziel put his penis in
M.B.'s mouth at least five times and that Braziel put M.B.'s penis in Braziel's mouth at least five
times. Braziel asserts that the evidence is unclear whether M.B. was referring to ten separate
occurrences on ten different occasions or whether the contact was more than once during the same
instance. We disagree. 
          We believe that, viewed in the light most favorable to the verdict, any rational trier of fact
could have found the essential elements of the assaults alleged beyond a reasonable doubt. Matson
v. State, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991) (following standard of Jackson v.
Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979)). We overrule
points two and three.
          We affirm the judgment.
 
                                                                                 BILL VANCE
                                                                                 Justice

Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed January 31, 1996
Do not publish