Braziel v. State 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-95-101-CR

        DAVID BJORN BRAZIEL,
                                                                                       Appellant
        v.

        THE STATE OF TEXAS,
                                                                                       Appellee
 

From the 18th District Court
Johnson County, Texas
Trial Court # 30397
                                                                                                    

O P I N I O N
                                                                                                    

          A jury convicted David Bjorn Braziel of ten counts of aggravated sexual assault of a child. 
Tex. Penal Code Ann. § 22.021 (Vernon 1994). The jury assessed punishment at life
imprisonment on each count. Braziel asserts on appeal that the court erred in denying his motion
for a mistrial and his motion for a directed verdict. He also complains that the evidence is
insufficient to sustain convictions for ten separate offenses. We will affirm the judgment.
          Testimony in the trial began February 21, 1994, with Judge C.C. "Kit" Cooke presiding. 
The State called the victim's stepmother as an "outcry"


 witness and then called the victim. 
During cross-examination of the victim, Judge Cooke asked the bailiff to excuse the jury. Judge
Wayne Bridewell, judge of the 249th District Court in Johnson County, met with the parties
outside the presence of the jury. He informed the parties that Judge Cooke had become ill and had
been taken to the hospital. Judge Bridewell then informed the jury of Judge Cooke's illness and
recessed the jury for the day.
          The following morning, Judge Bridewell met with the parties in chambers. He informed
them that Judge Cooke had suffered chest pains and numbness in his left arm, that he had been
taken to the hospital by ambulance, that he was in serious but stable condition, and that his doctor
anticipated his being away from work at least a week. Judge Bridewell informed the parties that,
due to Judge Cooke's unavailability, he intended to proceed with trial. He also informed the
parties that, at his direction, the court reporter had transcribed the previous day's testimony. 
Judge Bridewell inserted into the record a copy of the local rules of Johnson County, which had
been approved by the Texas Supreme Court, and a copy of an "Administrative Assignment"
authorizing the judge of the 249th District Court (among others) to "hold hearings and dispose of
cases when any Judge is unavailable for any reason as long as that Judge has jurisdiction by the
Constitution or statute to hear same."
          Braziel moved for a mistrial based on manifest necessity, due course of law under the
Texas Constitution, and the due process provisions of the United States Constitution. He argued
that, although Judge Bridewell had a transcript of the testimony, he was not "in a position to
evaluate the credibility of the witnesses." Furthermore, Braziel believed he would be prejudiced
by "the change of judges, and demeanors, and styles." Judge Bridewell denied the motion for
mistrial.
          In his first point, Braziel asserts that he was denied due process and effective assistance of
counsel when Judge Bridewell denied his motion for mistrial. District judges may "hold courts
for each other when they may deem it expedient . . . ." Tex. Const. art. V, § 11. "[T]he
common-law rule requiring that the same judge preside throughout the trial of a felony case has
been expressly abrogated by the Constitution and statutes of this State." Randel v. State, 153 Tex.
Crim. 282, 219 S.W.2d 689, 698 (1949) (opinion denying rehearing) (defendant not denied right
to jury trial by agreed substitution of judges). Likewise, the Court of Criminal Appeals did not
find error when one judge presided in voir dire in a murder case and another presided during the
hearing of the evidence and the receipt of the jury's verdict. Bellah v. State, 415 S.W.2d 418, 420
(Tex. Crim. App. 1967).
          The First Court of Appeals has addressed a due-process, due-course-of-law challenge under
similar facts. Ramirez v. State, 822 S.W.2d 240, 246 (Tex. App.—Houston [1st Dist.] 1991, pet.
ref'd). Ramirez was charged with the felony offense of delivery of cocaine. After two days of
testimony, the trial judge turned the bench over to another judge because of a family commitment. 
Id. Ramirez objected to the change because, among other things, a motion to suppress was being
"carried" with the trial, a motion to determine entrapment as a matter of law was pending, and
there was a question of whether the court would instruct a verdict of not guilty. Id. The second
judge stated that, if called upon to rule on such matters, he would have the court reporter "read
to the Court any pertinent portions of the testimony." Later, when Ramirez presented his
entrapment claim and motion for instructed verdict, the second judge withheld his ruling until he
reviewed the transcription of the court reporter's notes. Id. The First Court overruled Ramirez'
complaint. Id.
          Braziel asserts that Judge Bridewell was "not informed of the prior proceedings and was
joining the trial in mid-witness without any previous involvement in the case." The docket sheet
reflects that on February 9, Judge Bridewell heard and approved Braziel's motion to appoint a
doctor to determine his competency


 and that Judge Bridewell heard "various motions" that day. 
The docket sheet also indicates that the stepmother took the stand just before 10 a.m., that the jury
recessed for lunch from 11:30 a.m. until 1 p.m., and that Judge Cooke became ill at 2:15 p.m. 
 Although Judge Bridewell did not personally observe the testimony of the outcry witness, he was
present during part of the cross-examination and all of the redirect examination of the victim. 
Furthermore, the jury—the trier of facts on guilt and punishment—was present during the entire
trial. 
          Braziel's only other complaint about Judge Bridewell's rulings regards the denial of his
motion for a directed verdict. As discussed below, the court's ruling was not erroneous. Braziel
has not shown that he was harmed by the substitution of judges in any meaningful way. See id. 
          As to Braziel's effective-assistance-of-counsel complaint, he cites no deficiencies of counsel
which deprived him of a fair trial. See Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052,
80 L.Ed.2d 674 (1984); Stafford v. State, 813 S.W.2d 503, 505-06 (Tex. Crim. App. 1991). 
          We overrule point one.
          Braziel's second point complains that the court erred in overruling his motion for a directed
verdict. After the State rested and Braziel had presented defense testimony from several
witnesses, he moved for an instructed verdict of not guilty. Judge Bridewell denied the motion.


 
In his third point, Braziel asserts that the evidence is "insufficient to support a finding of guilt on
the indictment as written where there was no testimony that on ten separate occasions the appellant
sexually assaulted the complainant."
          A challenge to the court's ruling on a motion for an instructed verdict is, in actuality, a
challenge to the sufficiency of the evidence to support the conviction. Madden v. State, 799
S.W.2d 683, 686 (Tex. Crim. App. 1990). In reviewing the sufficiency of the evidence, we
consider all the evidence, both State and defense, in the light most favorable to the verdict. Id. 
If the evidence is sufficient to sustain the conviction, the court did not err in overruling Braziel's
motion. Id. Stated another way: If any rational trier of fact could find the elements of the offense
beyond a reasonable doubt, an instructed verdict is not proper. Id. Because we must conduct the
same sufficiency review for points two and three, we will simultaneously address the points.
          The indictment alleged ten counts of aggravated sexual assault of a child. Five counts
alleged that on five dates Braziel "intentionally and knowingly cause[d] the male sexual organ of
[the victim], a child younger than 14 years of age who was not the spouse of said defendant[,] to
contact the mouth of said defendant." The offenses were alleged to have occurred on September
15, 1992, January 15 and July 15, 1993, and January 15 and May 1, 1994. Five counts alleged
that, on the same five dates, Braziel "intentionally and knowingly cause[d] the penetration of the
mouth of [the victim], a child younger than 14 years of age who was not the spouse of said
defendant[,] with the male sexual organ of said defendant."
          We will summarize the evidence in the light most favorable to the verdict. M.B. is the son
of Vance Braziel and Kim Braziel. Vance and Kim had three children during their
marriage—M.B., his older brother V.B., and his younger sister R.B. Vance and Kim divorced
as a result of her relationship with David Braziel, Vance's brother. Kim and David eventually
married. Vance entered into a common-law marriage with Mary Evans. M.B. is the nephew and
stepson of the defendant. 
          Mary, the victim's stepmother, testified that M.B. and his siblings lived with Kim and
David in Grandview until about June 1, 1994. Mary testified that M.B. attended the second and
third grades in Grandview. At the end of the 1994 school year, Kim asked Vance and Mary to
take the children for the summer of 1994. The children remained with Vance and Mary after the
summer and enrolled in the Mansfield school district in the fall of 1994.
          Mary testified that on October 30, 1994, she and the two boys began talking about physical
abuse. They then began discussing sexual abuse and Mary told them, "if anybody ever touched
them where they didn't feel comfortable, tell me." According to Mary, M.B. became quiet and
asked to talk to her in private. Mary and M.B. went to his room and he related his story to her:
          [MARY]:      . . . . And he told me his stepfather, David Braziel, well, he used the word
"dick," had sucked his dick. And David had made him suck David's dick. 
And he told me that David peed in his mouth. And I said, what do you
mean? He said, well, white stuff came out and it made him sick, made him
throw up. And he told me that this happened several times, usually at
nighttime. And he told me that David would get him to get a hot dog to
practice on. He said to get the hang of it, to get used to it, that it was part
of life. That's what [M.B.] told me.
 
          [STATE]:      Did he tell you that this happened more than once?
 
          [MARY]:      Yes.
 
          [STATE]:      And did he tell you over what period of time this happened?
 
          [MARY]:      Well, he said it had happened for a couple of years.
Mary testified that, although M.B. had not told her a specific number of times these assaults had
occurred, he told her that "it had happened a lot."
          M.B. was an eleven-year-old fourth grader at the time of trial. He testified that, while he
was in the second and third grades, he had lived in Grandview with his mother, Kim, stepfather,
David, and his brother and sister. M.B. said that on one occasion, while his brother was away
spending the night with their step-grandmother, he was "sexually abused by [his] stepdad"—David
Braziel. M.B. testified that Braziel came into his bedroom during the night dressed in underwear
and, when M.B. woke up, "David Braziel was sucking on me. He made me suck on him." M.B.
further testified that Braziel was "sucking" on M.B.'s penis and that Braziel made M.B. "suck on
[his penis]." He said that Braziel "put sperm in my mouth." M.B. testified that he "got sick and
threw up." 
          The State then questioned M.B. about other details of the assaults and about the number
of times such incidents had occurred:
          [STATE]:      Did it happen more than one time?
 
          [M.B.]:         Yes.
 
          [STATE:       Let me ask you, [M.B.], I want you to think about this. Did he put his
penis, his penis, David Braziel's penis, in your mouth as many as five times
during the time that you were living in Grandview in the second and third
grades?
 
          [M.B.]:         Yes.
 
          [STATE]:      Did he put your penis in his mouth, the mouth of David Braziel, as many
as five times during the time you were living in Grandview, that is during
the second and third grade?
 
          [M.B.]:         Yes.
 
          [STATE]:      Now, did he also ask you to do something with a hot dog?
 
          [M.B.]:         Yes.
 
          [STATE]:      What is that?
 
          [M.B.]:         He told me to suck on it. . . . Because every time he put his penis in my
mouth I gagged.
 
          [STATE]:      And so why did he want you to do something with a hot dog?
 
          [M.B.]:         So I would get the hang of it, sucking on his, so I would get the hang of it.
          M.B. testified that the last incident happened at the end of third grade, just before he
moved out of Harold's Mobile Home Park in May 1994. The State questioned him further on the
number of incidents:
          [STATE]:      It happened at least five times to where he put his penis in your mouth; it
that right?
 
          [M.B.]:         Yes.
 
          [STATE]:      And it happened at least five times to where he put your penis in his mouth;
is that right?
 
          [M.B.]:         Yes.
          An indictment must allege "some date anterior to the presentment of the indictment, and
not so remote that the prosecution of the offense is barred by limitation." Tex. Code Crim.
Proc. Ann. art. 21.02(6) (Vernon 1989). Proof of the date is sufficient if the State proves the
offense occurred on a date anterior to the presentment of the indictment but within the statutory
limitations period. Ex parte Alexander, 685 S.W.2d 57, 59 n.1 (Tex. Crim. App. 1985). The
dates alleged are within the applicable ten-year statute of limitations. Tex. Code Crim. Proc.
Ann. arts. 12.01(2)(D), 12.03(d) (Vernon Supp. 1996). 
          The State established that M.B. was in the second and third grades in Grandview during
the dates alleged in the indictment. M.B. testified that during this time, Braziel put his penis in
M.B.'s mouth at least five times and that Braziel put M.B.'s penis in Braziel's mouth at least five
times. Braziel asserts that the evidence is unclear whether M.B. was referring to ten separate
occurrences on ten different occasions or whether the contact was more than once during the same
instance. We disagree. 
          We believe that, viewed in the light most favorable to the verdict, any rational trier of fact
could have found the essential elements of the assaults alleged beyond a reasonable doubt. Matson
v. State, 819 S.W.2d 839, 843 (Tex. Crim. App. 1991) (following standard of Jackson v.
Virginia, 443 U.S. 307, 318-19, 99 S.Ct. 2781, 2788-89, 61 L.Ed.2d 560 (1979)). We overrule
points two and three.
          We affirm the judgment.
 
                                                                                 BILL VANCE
                                                                                 Justice

Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed January 31, 1996
Do not publish



ent.write( WPFootnote20 );
 document.write( '
Close' );
 document.write( '' );
 }



      The terms of the article are mandatory; when an issue of fact is raised about whether the
evidence has been illegally obtained, a defendant has a statutory right to have the jury charged
accordingly.


 The court is not required to give the instruction, however, when the evidence does
not raise the issue.


 The State argues that, because the record did not raise a fact issue on
unlawfully obtained evidence, the court properly denied the special requested charge.



      At trial Rubio requested a special instruction on probable cause to arrest, arguing that
Aleman's testimony that Rubio did not appear to be intoxicated when he returned to the nightclub
on foot constitutes controverting evidence that he was not intoxicated at the time of the collision
in the parking lot. There is nothing in the record, however, to controvert Neal's testimony that
Rubio was intoxicated at the time he performed the field sobriety tests or that he was a danger to
himself and others. Because the officer's testimony supporting Rubio's arrest for public
intoxication was never controverted, he has failed to raise a fact issue regarding the legality of the
arrest.


 Accordingly, we overrule point of error two.
      In point three Rubio contends that the court erred in refusing his requested instruction
pertaining to the administration of the intoxilyzer test because Neal was at times thirty feet from
Rubio during the pre-examination observation period.


 Neal testified that he observed Rubio for
the required fifteen minutes, and this was not controverted by other evidence. That he was at
times thirty feet from Rubio did not create a fact issue on whether the required observation period
had occurred. Defense counsel did not cross-examine Neal regarding his ability to observe Rubio
from that distance. Based on the record as a whole, the evidence did not raise a fact issue on
whether the intoxilyzer results were illegally obtained. Accordingly, the court did not err when
it refused the requested instruction.


 Therefore, we overrule point of error three.
      In points four and five Rubio contends that the evidence is insufficient to support his
conviction for driving while intoxicated. In reviewing the legal sufficiency of the evidence, we
must determine whether, after viewing the evidence in the light most favorable to the verdict, any
rational trier of fact could have found the essential elements of the crime beyond a reasonable
doubt.



      Specifically, Rubio argues that there is legally insufficient evidence to prove that he was
intoxicated when he was driving the truck. Rubio's confession to driving the truck was
sufficiently corroborated by Neal's testimony.


 The State called Nannette Wavra, a technical
supervisor for the Texas Department of Public Safety, to testify as an expert witness on the
intoxilyzer test. She testified that, in her opinion, based on the results of the intoxilyzer test
conducted by Officer Neal at 1:17 a.m. on November 10, Rubio had an alcohol concentration in
excess of .10 two hours before the test. As a result, a rational jury could have found beyond a
reasonable doubt, that he was intoxicated at the time of the collision.
      Rubio also argues that, when evidence of Rubio's alcohol concentration is the sole method of
determining guilt, the use of the intoxilyzer test results, without corroboration, renders the
evidence insufficient. In addition to Neal's and Wavra's testimony, however, the videotaped
sobriety tests were admitted into evidence and played for the jury. Generally, in the absence of
all or a part of the statement of facts, it is presumed on appeal that sufficient evidence was
produced to support the findings of the jury.


 Because the videotape potentially reveals evidence
of Rubio not having the normal use of his mental or physical faculties, or even incriminating
statements made by Rubio during the course of the sobriety tests, we must presume that the
videotaped evidence presented to the jury, but not contained in the appellate record, supports the
jury's finding of guilt. As a result, we overrule points of error four and five.
      We affirm the judgment.
 
                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed December 22, 1993
Do not publish